Filed 8/25/22  P. v. Tate CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E077218 |
| v. | (Super.Ct.No. FWV20002032) |
| DOMINIQUE DESHAWN TATE, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Jon D. Ferguson, Judge.  Affirmed.

Jean Matulis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Amanda Lloyd, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant Dominque Deshawn Tate stabbed a woman multiple times causing her serious injuries. Defendant was convicted of attempted murder, personal use of a deadly and dangerous weapon, and personally causing great bodily injury to the victim.

Defendant contends on appeal that (1) he was denied his state and federal constitutional due process rights to present a defense when the trial court denied admission of statements made by his girlfriend to law enforcement that she had stabbed the victim; (2) he received ineffective assistance of counsel due to his counsel's failure to question the victim during cross-examination about her prior conviction and by admitting in closing argument that defendant stabbed the victim; and (3) the trial court erred by refusing to grant him relief on his *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*) motion.

## FACTUAL AND PROCEDURAL HISTORY

### A. PROCEDURAL HISTORY

On March 25, 2021, a jury found defendant guilty of attempted murder (Pen. Code, §§ 664, 187, subd. (a)).[1] In addition, the jury found the special allegations true that he personally used a deadly and dangerous weapon (§ 12022, subd. (b)(1)) and personally inflicted great bodily injury on the victim (§ 12022.7). In a bifurcated proceeding, after waiving his right to a jury trial, defendant admitted to having suffered two serious and violent felony convictions (§§ 667, subds. (a)(1), (b)-(i), 1170.12, subds. (a)-(d)). The

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

trial court denied defendant's *Romero* motion to dismiss one of his prior strike convictions. He was sentenced to 27 years to life plus 14 years, to be served in state prison.

B.    FACTUAL HISTORY

The victim knew defendant because he was an uncle to her 14-year-old son, J.B. The victim and J.B. lived in a two-story house in Chino Hills. The victim let defendant and his girlfriend, Iyani Shahid, move into her house on May 2, 2020; they could stay until they got their own place. Defendant and Shahid gave her $800 to live in the house for one month.

The first several weeks that defendant and Shahid lived in the house everything was fine. In the second week, defendant asked if he could have his stepson stay the night at the house; his stepson was the same age as J.B. She told him no and defendant did not have a problem. On May 21, 2020, defendant texted her and asked again if his stepson could stay the night. She again told him no.

On the morning of May 22, the victim was sitting on her bed when defendant knocked on her bedroom door. She told him to come in. He told her that he was packing his things and moving to Las Vegas because he did not like that she told him that he could not have his stepson stay at the house. He also complained that the victim had confronted Shahid about using some of her hygiene products that were in the bathroom.

Defendant asked the victim to give him $400 back. It was toward the end of the month so the victim told him that she could only give him back $200. Defendant got

3

aggressive and yelled "I'm Fruit Town Piru." Defendant punched his hand with his fist. She told him if he touched her she would call the police.

Defendant jumped on the bed and got on top of the victim. He started hitting her. She thought he was only hitting her with his fist but she started bleeding. She realized that he was stabbing her with a pocket knife. She only recalled that it was silver. The first blow was to her face, which caused half of her cheek to hang off her face. The victim begged for her life.

Defendant dragged the victim from the bedroom by her hair to the hallway and continued to stab her. She had cuts on her breast, arm, back, and armpit. Defendant continued to stab her. The victim again pleaded for her life. He responded, "Bitch, I'm about to kill you. Bitch, you about to die. And I'm not going back to jail." Shahid had been in the shower and emerged from the bathroom. She begged defendant to stop stabbing the victim.

J.B. started up the stairs while defendant was stabbing the victim. The victim could only see the top of his head. Defendant told him to stay downstairs. Defendant then dragged the victim to the bathroom, got on his knees and wrapped his arms around her legs. He begged her to forgive him for what he had done. The victim was scared so she told him that she forgave him. She told him that she had to call the police because of her injuries. Defendant got up and ran into the room he was sharing with Shahid. The victim found her cellular telephone and ran outside. She went past J.B.'s bedroom but the door was closed. She went two houses down and dialed 911. While she was on the phone with the police, she observed defendant and Shahid leave the house. He was

4

carrying a trash bag.  They drove off.  When the police arrived, she sat down on the ground as she was about to pass out.

The victim was placed in an ambulance and taken to the hospital.  She had to get stitches and staples for her wounds.  The victim had 11 stab wounds including on her cheek, left forearm, upper left arm, on her back, shoulder, armpit, and breast.  She had scars from the stab wounds.  She stayed in the hospital for four days.

The victim admitted on direct examination that she had suffered a misdemeanor conviction for passing a check with insufficient funds in 2019.  On cross-examination, she indicated that J.B.'s father was in prison and she spoke on the phone with him; they did not write letters to each other.

J.B. testified he was in his room downstairs when he heard the victim screaming.  He could also hear Shahid screaming and he could hear defendant's voice.  He started up the stairs.  He observed the victim was bleeding.  She was yelling at defendant to stop.  Defendant was holding a knife facing the victim.  He had blood on his shirt.  Shahid was standing behind defendant and was screaming for him to stop.  Defendant yelled at J.B. to go back downstairs.  J.B. complied and locked himself in his room.  J.B. was afraid defendant would come after him next.  While he was in his room, he could hear defendant begging the victim not to call the police.  He heard defendant and Shahid rush out of the house and drive off in their car.

J.B. went outside and found the victim on the ground in the driveway.  She was bleeding.  He went back inside prior to the police arriving.  J.B. never saw defendant actually stab the victim.  He did not recall telling an officer that once he heard the victim

5

screaming he never left his room. He claimed he was scared at the time. He insisted he left his room and started up the stairs. He told another officer just after the stabbing that he saw blood on defendant's shirt and that defendant had a knife.

San Bernardino County Sheriff's Deputy Garcia responded to the victim's home on May 22, 2020, at approximately 7:50 a.m. When she arrived, she found the victim sitting in the driveway. She was bleeding profusely and holding her face. The victim was bleeding from multiple stab wounds and was frantic. A chunk of her cheek was missing and her left cheek was hanging off of her face. She had large open lacerations on her left arm, forearm, and armpit. Deputy Garcia applied gauze to the victim's face to stop the bleeding.

The victim immediately told Deputy Garcia who had attacked her. Deputy Garcia spoke with J.B.; he was withdrawn and seemed scared. He told Deputy Garcia that he heard the victim telling "him" to stop and a thudding or hitting sound. J.B. told Deputy Garcia that defendant lived in the house.

Deputy Garcia videotaped a walk through the house. There was blood found on a pillow in the victim's bedroom, at the bottom of the staircase, blood splatter was on the walls, and there was blood in the bathroom. Defendant's cellular telephone was found in the driveway. Identification for Shahid and defendant were found in the bedroom they were staying in. Several letters written by J.B.'s father and sent from prison were found in the victim's room. Defendant was arrested in Las Vegas.

Defendant presented no evidence on his behalf.

6

## DISCUSSION

### A.      EVIDENCE CODE SECTION 1230

Defendant contends his state and federal constitutional due process rights to present a defense were violated by the trial court's exclusion of a statement made by Shahid—which she later recanted—to law enforcement confessing to stabbing the victim. Defendant insists the statement was admissible pursuant to Evidence Code section 1230 as a declaration against interest. The People contend the statement by Shahid was hearsay and was properly excluded by the trial court.

#### 1.      *ADDITIONAL FACTUAL HISTORY*

Prior to trial, defendant's counsel informed the trial court that he may call Shahid as a witness. Shahid had been interviewed by two San Bernardino County Sheriff's Department detectives after the stabbing. Shahid told the detectives that on the day of the stabbing, she had decided that she wanted to leave the victim's house. She went to the victim's room to ask that half of the $800 that she had given the victim for rent be given back to her. The victim grabbed Shahid's phone, "snatched" chains off of her, and got in her face. The victim punched Shahid in the face and got on top of her. The victim choked Shahid. Shahid begged her to get off of her and then starting stabbing the victim. Defendant had to take the knife from her. Shahid was then given her *Miranda*[2] warnings. She did not want to hurt the victim; she was only protecting herself. The detectives took a break.

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

The interview resumed. One of the detectives advised Shahid that they believed she was lying and they knew she had not stabbed the victim. Shahid then stated that she did not know what had happened to the victim because she had been in the bathroom. She heard the victim and defendant arguing in the victim's bedroom. She denied that she had stabbed the victim. She did not witness defendant stab the victim but she knew the victim had been stabbed. She insisted she decided to lie and take the blame on her own; she denied that defendant told her to lie for him. She did it for "love."

The trial court reviewed the two interviews to determine whether they were admissible pursuant to Evidence Code section 1230.

Defendant's counsel stated that Shahid was an unavailable witness as she was living out of state and he had not been able to subpoena her. Further, it was his understanding based on a telephone conversation with her that she would "plead the Fifth" if called to testify. The trial court was not certain if defendant had proven that Shahid was unavailable. Nonetheless, even if the trial court presumed that Shahid was unavailable as a witness, it would find that the statement did not qualify as being against her interest. The statement showed that she was claiming self defense. Additionally the statement was inherently untrustworthy as 20 minutes later, Shahid recanted her statement and insisted that defendant stabbed the victim. The trial court excluded the statement on the grounds it was not against Shahid's interest and it was untrustworthy.

2.    *ANALYSIS*

"A declaration against interest is an exception to the general rule that hearsay statements are inadmissible under California law. [Citations.] 'Evidence Code section

8

1230 provides that the out-of-court declaration of an unavailable witness may be admitted for its truth if the statement, when made, was so far against the declarant's interests, penal or otherwise, that a reasonable person would not have made the statement unless he or she believed it to be true.' [Citation.] The focus of the declaration against interest exception to the hearsay rule is the basic trustworthiness of the declaration. [Citation.]" (*People v. McDaniel* (2021) 12 Cal.5th 97, 132.)

"The proponent of such evidence must show 'that the declarant is unavailable, that the declaration was against the declarant's penal interest, and that the declaration was sufficiently reliable to warrant admission despite its hearsay character.' " (*People v. Lucas* (1995) 12 Cal.4th 415, 462.) " 'In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' " (*People v. Grimes* (2016) 1 Cal.5th 698, 711 (*Grimes*).)

"We review a trial court's decision whether a statement is admissible under Evidence Code section 1230 for abuse of discretion." (*Grimes*, *supra*, 1 Cal.5th at pp. 711-712.)

Here, we will assume, as the trial court, that Shahid was an unavailable witness. The trial court properly determined that Shahid's statement was not a declaration against her interest. Although Shahid came to the station and confessed to stabbing the victim, she stated she had stabbed the victim in response to the victim hitting her in the face and

9

pinning her to the ground. She was adamant she never intended to harm the victim and she only acted in response to the victim's actions. The trial court properly concluded that the first statement by the victim was not against her interests considering the circumstances and the relationship between her and defendant.

Defendant insists that since the detectives who were interviewing Shahid gave her *Miranda* warnings after she advised them that she stabbed the victim, it shows that the statement was against her penal interest. This has no bearing on whether the trial court could properly conclude that the statement was not against Shahid's interest. The trial court could make an independent determination of whether it qualified under Evidence Code section 1230.

Nonetheless, even if Shahid's statement could be found to be against her interests, the statement was not trustworthy. After a break, the detectives informed Shahid that they knew she was lying. Shahid then admitted she had not stabbed the victim, that defendant and the victim had been arguing, and that she had kept telling defendant to "stop." The trial court could properly determine that Shahid's earlier statement that she had stabbed the victim was disingenuous. In fact, Shahid admitted she had lied because of her "love" for defendant. Shahid's statement was clearly motivated by a desire to protect defendant without also implicating herself, making it untrue testimony. (*Grimes*, *supra*, 1 Cal.5th at p. 711.) The trial court properly excluded Shahid's statement as unreliable hearsay.

Defendant insists this evidence should have been admitted as third-party culpability evidence because the evidence was strong enough to raise a reasonable doubt

10

about whether defendant was guilty. However, as noted by the People, the statement must first be admissible in order to be considered as third-party culpability evidence. (See *People v. McCurdy* (2014) 59 Cal.4th 1063, 1109-1110 [third-party culpability evidence properly excluded because it was found by the trial court to be inadmissible hearsay and unreliable].)

We also reject that the exclusion of the evidence violated defendant's federal and state constitutional rights to present a defense. " 'There was no error under state law, and we have long observed that, "[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [state or federal constitutional] right to present a defense." ' " (*People v. Prince* (2007) 40 Cal.4th 1179, 1243.)

The trial court did not abuse its discretion by excluding Shahid's pretrial statements as they were unreliable and inadmissible hearsay.

### B. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends his counsel provided ineffective assistance of counsel by (1) failing to inquire of the victim about her prior conviction on cross-examination; and (2) advising the jury that defendant had the victim " 'cornered in her bedroom on top of her with a knife, no one else is in there.' "

#### 1. *STANDARD OF REVIEW*

"The standard for showing ineffective assistance of counsel is well settled. 'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable

11

probability, that is, a probability sufficient to undermine confidence in the outcome. [Citations.]  A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.  Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel.' " (*People v. Gray* (2005) 37 Cal.4th 168, 206-207; see also *Strickland v. Washington* (1984) 466 U.S. 668, 687.)

"A defendant who raises the issue on appeal must establish deficient performance based upon the four corners of the record." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003.)

### 2.    *QUESTIONING ABOUT PRIOR CONVICTION*

Defendant acknowledges that the prosecutor asked the victim during direct examination whether she had suffered a prior conviction for passing a check with insufficient funds.  However, he insists that the prosecutor "whitewashed" the conviction and that his counsel should have inquired further during cross-examination to advise the jurors that such conviction had an element of fraud.

#### a.    Additional Factual History

Prior to trial, the People filed a trial brief which set forth that the victim had a misdemeanor conviction for violating section 476a, subdivision (a), passing a check with insufficient funds from December 2019.  The People sought to exclude the prior incident. The trial court addressed the conviction prior to trial.  The trial court found that the misdemeanor conviction for violating section 476a was a moral turpitude offense.  An

12

element of the crime was an intent to defraud. It limited its admission to the elements of the charge, the date of conviction, and the county of conviction.

During the victim's testimony, the following exchange occurred between her and the prosecutor:

"[Prosecutor:] Now, [victim], . . . did you suffer a misdemeanor conviction for passing a check with insufficient funds in 2019?

[The victim:] Yes.

[Prosecutor:] Does that have anything to do with your testimony today?

[The victim:] No.

[Prosecutor:] Does you having that conviction or having done that prior act mean you're not telling the truth about this incident today?

[The victim:] No."

There was no mention of the prior conviction by defendant's counsel during cross-examination of the victim.

At the conclusion of evidence, the jury was instructed, "If you find that a witness has committed a crime or other misconduct, you may consider that fact only in evaluating the credibility of the witness's testimony. [¶] The fact that a witness may have committed a crime or other misconduct does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable."

b.  Analysis

Defendant insists that his counsel should have questioned the victim about her prior conviction, particularly that fraud was an element of section 476a. This element of fraud was a key element in determining the truthfulness of the victim's testimony. Defendant insists this was not a tactical strategy as counsel had fought to have the prior conviction admitted to impeach the victim's credibility. Here, the reasons why counsel chose not to further address the prior conviction on cross-examination are not apparent from the record.

"An ineffective assistance claim is conventionally brought in a petition for habeas corpus rather than on direct appeal. [Citation.] There are myriad reasons why counsel may choose a particular course of conduct, and attorneys should be afforded the opportunity to explain if a decision was tactical when a client alleges their assistance fell below professional standards. Generally, it is 'inappropriate for an appellate court to speculate as to the existence or nonexistence of a tactical basis for a defense attorney's course of conduct.' " (*People v. Zaheer* (2020) 54 Cal.App.5th 326, 336.) "In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions." (*People v. Weaver* (2001) 26 Cal.4th 876, 926.)

Here, trial counsel's reasons for not further addressing the victim's prior conviction during cross-examination is not apparent from the record. We can conceive of a tactical reason; that the prosecutor had already mentioned the prior conviction during

14

direct examination. Further, it is conceivable that defendant's counsel wanted to focus on the victim lying about letters she received from J.B.'s father. In fact, during closing argument, defendant's counsel argued that the victim had denied that she and J.B.'s father had written letters to each other while he was in prison. However, letters from him to the victim were found in her bedroom. It showed that the victim was willing to lie and that the jury should not believe her. Defendant's counsel may have believed this was a stronger argument.

This issue is more properly addressed in a habeas corpus proceeding because the record is silent as to the reason defendant's counsel failed to raise the issue on cross-examination. We cannot provide relief on appeal.

### 3. *CLOSING ARGUMENT*

Defendant further contends his counsel was ineffective because he should not have argued during closing argument that defendant had the victim cornered in her bedroom and there was no one else in the room. He insists that instead of arguing that defendant had no intent to kill, he should have argued that defendant may not have had the knife.

#### a. Additional Factual History

During closing argument, defendant's counsel argued that the People had the burden of proving that defendant had an intent to kill the victim. Defendant's counsel told the jury that he was not going to try to argue that the victim did not suffer the stab wounds. Defendant's counsel argued that if defendant intended to kill the victim, she would be dead. It was just defendant and the victim in her bedroom. Defendant was in control and could have killed her because there was no one to stop him. Defendant's

15

counsel argued, "Just think about that. Who is going to stop him? No one. She's cornered. He's in a position of authority. He has a weapon. He's on top of her. She would be dead."

Defendant's counsel argued about the victim's claim that defendant threatened her that she was going to die. Defendant's counsel argued, "When you apply that burden [beyond a reasonable doubt] to [the victim's] testimony, you'll see that in regards to that statement, it falls flat. There is absolutely no evidence of that. I'm not trying to minimize her injuries at all. I am not doing that. Okay. However, if you logically think about this, my client's actions support the fact that he never said those statements, because as I stated before, he has her cornered in her bedroom on top of her with a knife, no one else is in there. If he has an intent to kill her, he's going to kill her. He's going to kill her in the hallway." Defendant's counsel argued the People had not met their burden of proving defendant's intent to kill beyond a reasonable doubt.

b.      Analysis

A reviewing court must afford "great deference" to trial counsel's tactical decisions "to avoid 'second-guessing counsel's tactics and chilling vigorous advocacy.' " (*In re Fields* (1990) 51 Cal.3d 1063, 1069-1070.) "[C]ounsel does not render ineffective assistance by choosing one or several theories of defense over another." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1007.) Here, defendant's counsel reasonably chose to advise the jury that although defendant had the knife, he never had the intent to kill the victim. This was a reasonable defense in light of the evidence introduced at trial. J.B. had testified he saw defendant standing over the victim holding a knife and Shahid was

16

behind him.  The victim testified that defendant was the one who stabbed her.

Defendant's counsel made a reasonable tactical decision, based on the evidence, to argue

there was no intent to kill.  Defendant has not met his burden of showing ineffective

assistance of counsel.

C.     _ROMERO_ MOTION

Defendant contends the trial court should have struck one of his prior

convictions—his 2012 attempted burglary conviction—on the grounds he had a troubled

childhood during which he was exposed to gangs and drug dealing.  This would result in

a fair and just sentence.

1.     _DEFENDANT'S ROMERO MOTION AND RULING_

Prior to sentencing, defendant filed a motion to dismiss his prior strike conviction

of attempted burglary dating back to 2012.  Defendant's counsel provided defendant's

background.  Defendant was 30 years old.  He was raised in a "gang infested

neighborhood" in Compton.  His mother was a documented gang member who suffered

from drug addiction her entire life.  Defendant's father was a member of the Fruit Town

Piru gang and was not present during his childhood.  Defendant lived with various

relatives when mother was in jail or rehabilitation facilities.  When defendant was 12

years old, he moved in with his father in Las Vegas.  When defendant was 14 years old,

his father was convicted of drug trafficking and sent to prison.  Defendant moved back to

Compton and joined the Fruit Town Piru gang.  Both of defendant's siblings were gang

members and were in prison.

17

Defendant committed his first qualifying prior strike offense of attempted burglary in 2011 when he was 20 years old. He pled guilty to attempted burglary and was sentenced to two years. In October 2012, after being released on the attempted burglary, he was arrested for residential burglary and pled guilty. He was sentenced to nine years in state prison. Defendant's counsel argued that defendant would still have a long sentence of 24 years if the trial court struck the 2012 prior conviction. Further, both of the prior convictions were for non-violent felonies.

The People filed opposition. The People outlined defendant's criminal history. As a juvenile, between 2005 and 2007, defendant had arrests or contacts with law enforcement for vandalism, burglary, shooting at an inhabited dwelling or vehicle, grand theft, assault with a firearm and resisting a police officer. In 2010, defendant was convicted of carrying a concealed firearm for which he received a two-year state prison sentence. He twice violated his probation. The facts of the 2012 offense were that defendant and two other accomplices cut a window screen to gain access to a house. While still on parole for that offense, he and two other suspects cut a window screen to gain access to a home. The home was ransacked and jewelry was missing.

The People argued that the current offense was a "brutally violent crime." Further, defendant tried to manipulate his girlfriend to take responsibility for the crime. In a recorded jail call, he tried to get her to testify that she stabbed the victim. He had shown no remorse.

18

The probation report set forth defendant's convictions which included (1) a conviction on February 5, 2010, for possession of a firearm, for which he received a two-year sentence after his probation was revoked; (2) a conviction on January 31, 2012, for attempted burglary for which he received a two-year state prison sentence; and (3) a conviction on March 20, 2013, for first degree felony burglary for which he was sentenced to nine years.

At the hearing on the *Romero* motion, the trial court first stated it had taken into consideration defendant's upbringing. However, defendant had been convicted of three "prior felonies in relatively quick succession." The trial court noted, "He was sentenced in 2010 for possession of a firearm on a person in a vehicle with a prior conviction. He received two-years state prison at that time, after a probation violation. [¶] After he was released from state prison in September of 2011, he picked up an attempted residential burglary, which is, of course a strike offense. He received two-years state prison on that offense in January of 2012. [¶] In October 2012, which would have been necessarily just strictly after his release from prison on that strike offense. He was convicted of residential burglary . . . . The offense date was October of 2012. The conviction and sentence was March of 2013." He was sentenced to nine years in prison because of the prior strike offense. He committed the instant offense while on parole.

The trial court further stated, "And the current offense was particularly violent in a personal way, cutting the victim's face and stabbing her, 11 stab wounds, total, and the potential disfiguring of the victim. Certainly a great bodily injury enhancement was found true." The trial court found there was minimal provocation and there was some

19

sophistication as defendant fled to another state after the crime. The trial court stated, "[O]verall, on balance, even taking into consideration his upbringing, he had a lot—three attempts through the system, prison commitments. The system has failed to rehabilitate him. And this is an increasing level of violence and dangerousness for all reasons stated. [¶] I cannot say that [defendant] does not fall within the spirit of the three-strikes law. One can argue he is a poster child for it. Being on parole for serious felonies and having his sentencing enhanced by a second strike. . . . [¶] I think if the Court were to grant the motion, I think it would represent, maybe, an antipathy for the strikes law, more than a particularized determination applying it to this case and this defendant."

The trial court concluded, "I just don't think there is a basis in review of these as to discretion to strike one of his prior convictions in this case. The motion is respectfully denied."

2.      *ANALYSIS*

A trial court may dismiss a prior strike conviction under section 1385 "in furtherance of justice." (§ 1385, subd. (a).) In determining whether to strike a prior conviction, the trial court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

20

The denial of a *Romero* motion is reviewed under the deferential abuse of discretion standard. (*People v. Williams*, *supra*, 177 Cal.4th at p. 162.) " 'Under that standard an appellant who seeks reversal must demonstrate that the trial court's decision was irrational or arbitrary. It is not enough to show that reasonable people might disagree about whether to strike one or more of [the] prior convictions. Where the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm the trial court's ruling, even if we might have ruled differently in the first instance.' " (*People v. Romero* (2002) 99 Cal.App.4th 1418, 1434.)

Here, the trial court considered defendant's childhood, his criminal history and the circumstances of the current crime. Defendant committed his prior offenses relatively close together and committed each of these crimes while on probation or parole for other offenses. Further, the circumstances of the current crime were particularly violent and personal. Defendant attacked the victim in her own home, causing severe and gruesome injuries. As stated by the trial court, defendant was the "poster child" for a three-strikes sentence. The sentence imposed on defendant based on all of the circumstances was fair and just. The trial court did not abuse its discretion by denying defendant's *Romero* motion.

**DISPOSITION**

The judgment is affirmed in full.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER

J.

We concur:

RAMIREZ

P. J.

FIELDS

J.